UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAROLYN JEAN MORENO,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | No. 1:22-cv-00583-GSA<br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF PLAINTIFF AND AGAINST DEFENDANT**<br><br>**(Doc 13, 19)** |

### I.  Introduction

Plaintiff Carolyn Jean Moreno appeals the decision of the Commissioner of Social Security denying her application for supplemental security income (SSI) under Title XVI of the Social Security Act.[1] Because substantial evidence and applicable law do not support the ALJ's decision, the appeal will be granted.

### II.  Factual and Procedural Background

On October 4, 2019, Plaintiff applied for SSI alleging disability due to varicose veins, deep vein thrombosis, and related complications. The applications were denied initially and on reconsideration. AR 74; 82. The ALJ held a hearing on February 3, 2021. AR 33–50. On April 22, 2021, the ALJ issued an unfavorable decision. AR 15–32. The Appeals Council denied review on January 20, 2022, and this appeal followed.

### III.  The Disability Standard

Under 42 U.S.C. §405(g), this court has the authority to review the Commissioner's denial of disability benefits. Reversal is appropriate when the ALJ's findings are based on legal error or unsupported by substantial evidence." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999). Substantial evidence is that which could lead reasonable minds to accept a conclusion. *See Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is more than a scintilla but less than a

---

[1] The parties consented to the jurisdiction of a United States Magistrate Judge. Docs. 9, 20.

1

preponderance. *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996).

The court must consider the record as a whole, not isolate a specific portion thereof. *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006). If the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted). "[T]he court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008).

> To qualify for benefits under the Social Security Act, a plaintiff must establish that he or she is unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment that has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. § 1382c(a)(3)(A). An individual shall be considered to have a disability only if . . . his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work, but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §1382c(a)(3)(B).

A disability claim is evaluated using five-step analysis. 20 C.F.R. §§ 416.920(a)-(f). The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled. 20 C.F.R. §§ 416.927, 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level. 20 C.F.R. § 416.920(a)-(f). While the Plaintiff bears the burden of proof at steps one through four, the burden shifts to the commissioner at step five to prove that Plaintiff can perform other work in the national economy given her RFC, age, education

and work experience. *Garrison v. Colvin*, 759 F.3d 995, 1011 (9th Cir. 2014).

**IV.    The ALJ's Decision**

At step one the ALJ found that Plaintiff had not engaged in substantial gainful activity since her SSI application date of October 4, 2019.  AR 20.  At step two the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease, spine disorders, varicose veins of lower extremity, and coagulation disorders.  AR 20–22.  The ALJ also determined at step two that Plaintiff's anxiety disorder did not cause more than minimal limitation in the claimant's ability to perform basic mental work activities and was therefore non-severe.  AR 21–22.

At step three the ALJ found that Plaintiff did not have an impairment or combination thereof that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 22.

Prior to step four the ALJ evaluated Plaintiff's residual functional capacity (RFC) and concluded that Plaintiff had the RFC to perform medium work as defined in 20 C.F.R. 404.1567(c) subject to the following:

> [the claimant] can lift or carry 20 pounds occasionally and 10 pounds frequently. She can stand or walk for 2 hours in an 8-hour workday. She can sit for 6 hours in an 8- hour workday. She can push or pull in the limits for lifting and carrying. She can frequently climb ramps and stairs. She can occasionally climb ladders, ropes and scaffolds. She can frequently kneel and crouch. She can occasionally stoop and crawl. She should not work at unprotected heights or around dangerous machinery.

AR 22–26.

At step four the ALJ concluded that Plaintiff had no past relevant work.  AR 26.  At step five, in reliance on the VE's testimony, the ALJ concluded that there were jobs existing in significant numbers in the national economy which Plaintiff could perform: lens inserter, wire wrapper, semi-conductor bonder.  AR 27.  Accordingly, the ALJ concluded that Plaintiff was not disabled at any time since the application date of October 4, 2019.  AR 27.

**V.    Issues Presented**

Plaintiff asserts two claims of error: 1) that the ALJ failed to properly weigh the opinion of her treating physician, Dr. Pandya; and, 2) that the ALJ failed to offer sufficient reasoning for

discounting Plaintiff's subjective complaints, and offered much of the same reasoning for discounting Dr. Pandya's opinion and Plaintiff's testimony, which was equally flawed in both respects.

Both claims of error will be addressed below but not necessarily as two entirely distinct issues.

### A.     RFC Generally; Dr. Pandya; Plaintiff's Testimony

#### 1.     Applicable Law

Before proceeding to step four, the ALJ must first determine the claimant's residual functional capacity. *Nowden v. Berryhill*, No. EDCV 17-00584-JEM, 2018 WL 1155971, at *2 (C.D. Cal. Mar. 2, 2018). The RFC is "the most [one] can still do despite [his or her] limitations" and represents an assessment "based on all the relevant evidence." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC must consider all of the claimant's impairments, including those that are not severe. 20 C.F.R. §§ 416.920(e), 416.945(a)(2); Social Security Ruling ("SSR") 96–8p.

In doing so, the ALJ must determine credibility, resolve conflicts in medical testimony and resolve evidentiary ambiguities. *Andrews v. Shalala*, 53 F.3d 1035, 1039–40 (9th Cir. 1995). "In determining a claimant's RFC, an ALJ must consider all relevant evidence in the record such as medical records, lay evidence and the effects of symptoms, including pain, that are reasonably attributed to a medically determinable impairment." *Robbins,* 466 F.3d at 883. *See also* 20 C.F.R. § 404.1545(a)(3) (residual functional capacity determined based on all relevant medical and other evidence). "The ALJ can meet this burden by setting out a detailed and thorough summary of the facts and conflicting evidence, stating his interpretation thereof, and making findings." *Magallanes v. Bowen*, 881 F.2d 747, 751 (9th Cir. 1989).

For applications filed on or after March 27, 2017, the new regulations eliminate a hierarchy of medical opinions, and provide that "[w]e will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s),

including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, when evaluating any medical opinion, the regulations provide that the ALJ will consider the factors of supportability, consistency, treatment relationship, specialization, and other factors. 20 C.F.R. § 404.1520c(c). Supportability and consistency are the two most important factors and the agency will articulate how the factors of supportability and consistency are considered. *Id.* "Even under the new regulations, an ALJ cannot reject an examining or treating doctor's opinion as unsupported or inconsistent without providing an explanation supported by substantial evidence." *Woods v. Kijakazi*, 2022 WL 1195334, (9th Cir. Apr. 22, 2022) at *6

### 2. Analysis

Dr. Pandya indicated the limitations he identified were secondary to varicose veins, swelling, and deep vein thrombosis. AR 356. As such, Plaintiff's first argument relates only to vein conditions, and her discussion of anxiety relates to the ALJ's non-severity finding concerning the same, which Plaintiff addresses in her second argument. The identified impairments are set forth below.

#### a. Lumbar Spine

Plaintiff does not directly address her lumbar spine impairment in either of her arguments. In Plaintiff's factual summary she addressed the following related evidence (which is somewhat truncated here for efficiency's sake): 1) January 2019 visit for radicular back pain and refills of baclofen and naproxen (AR 422); 2) two April 2019 visits for radicular back pain both of which documented positive straight leg raise on the right, Toradol injection was administered, Neurontin was prescribed, and referred for physical therapy (AR 408, 412); 3) April 2019 x-rays showing decreased disc space at L5-S1 with lumbar levoscoliosis and a spina bifida occulta defect at L5 (AR 471); 4) June 24, 2019 physical therapy records documenting reported radicular pain level 8/10, reduced lumber spine range of motion, reduced hip strength, tenderness over L3-L5 and

positive slump test (AR 346); 5) similar findings and reports noted on July 1, 2019 and July 8, 2019 at which point she was discharged from physical therapy due to lack of progress (AR 365, 356); 6) July 29, 2019 follow up for unchanged radicular back pain, documenting ROM and strength deficits (AR 399); 7) September 16, 2019 lumbar spine MRI documenting mild broad rightward thoracolumbar scoliosis with asymmetric narrowing of the intervertebral disc spaces at L3-S1, chronic endplate degenerative changes at L5, and a mild posterior disc bulge at L3-4 (AR 366); 8) October 1, 2019 visit for chronic back pain documenting tenderness throughout the back and referring Plaintiff to pain management (AR 391); 9) March 2020 and July 2020 follow ups (again with PA-C Packer, not pain management) documenting systemic tenderness and injection with Toradol and referral to a new pain management clinic due to scheduling issues with the first pain management PA-C Packer referred her to (AR 496, 504, 506, 507); and, 10) August 25, 2020 and September 29, 2020 visit with NP-C Monticello for back pain radiation to hips 10/10 severity with reported decreased sensation and balance issues, documenting decreased ROM throughout with tenderness and positive spurling test, at which NP-C Monticello prescribed tramadol and ordered bilateral medial branch blocks at L3-L5 (AR 579–84; 574–77).

The ALJ acknowledged these objective findings but also noted countervailing findings on the same subjects, including: 1) the September 2019 lumbar spine MRI noting widely patent (i.e. open and unobstructed) spinal canal and neural foramina throughout the lumbar spine with no encroachment on exiting or transiting nerve roots, no central canal stenosis, and no other significant abnormality despite the mild degenerative changes, mild disc bulge, and mild scoliosis (Ex. 8F/1; **AR 366**); 2) physical examinations showing normal range of motion, normal alignment, and normal strength (Exs. 15F/24, (**AR 560**); 10F/13 (**AR 388**), 28 (**AR 403**), 33 (**AR 408**), 36 (**AR 560, 388, 403, 408, 411**), 73 (**AR 448**); 11F/10 (**AR 496**); 12F/2, 9 (**AR 503, 510**); 1F/8 (**AR 251**); 2F/11 (**AR 267**)) despite instances of decreased range of motion at some exams secondary to guarding.

(Exs. 11F/10 (**AR 496**); 12F/3, 5 (**AR 504, 506**); 3) lower extremity strength was generally normal at 4-5/5. (Exh. 10F/24 (**AR 399**); 16F/2 (**AR 575**); 4) normal gait with heel walking and toe walking intact (Exh. 16F/2, 8 (**AR 575, 581**); and, 5) generally normal neurological exams with normal motor functioning and normal sensation (Exs. 10F/1, 33 (**AR 376**); 11F/1 (**AR 487**); 16F/3 (**AR 576**).

Thus, the record contained either normal or mixed findings in essentially every respect as follows: 1) imaging (mild degenerative changes, mild bulging disc, and mild scoliosis, but no neural impingement); 2) straight leg raise (a provocation test for sciatic nerve root entrapment, which was sometimes positive and sometimes negative); and, 3) range of motion, motor strength, gait, sensation, heel and toe walking. The legal standard provides that if the evidence could reasonably support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision. *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).

Plaintiff does not identify any testimony concerning her spine conditions either in Plaintiff's argument sections, in the "summary of relevant testimony," or in the reply brief. MSJ at 6, 11–14, Doc. The nearest discussion was Plaintiff's rebuttal to the ALJ's characterization of her treatment as a whole as conservative (perhaps as to her veinous impairments and spinal impairments, though the context of the ALJ's discussion suggests the focus was more on the former) AR 24.

Plaintiff disputes that characterization as to her lumbar spine, emphasizing that she received Toradol injections and that injections are generally not considered conservative. However, the two cases Plaintiff cites involve epidural steroid injections. *Joanne G. v. Berryhill* (C.D. Cal., May 29, 2019, No. EDCV 18-0997-JPR) 2019 WL 2303833, at *12 (*citing Christie v. Astrue,* No. CV 10-3448-PJW., 2011 WL 4368189, at *4 (C.D. Cal. Sept. 16, 2011). Toradol, by contrast, is a non-steroidal anti-inflammatory that can be administered in an office visit.

Plaintiff also emphasizes that she was scheduled for bilateral median branch blocks due to degenerative disc disease with back pain radiating to the legs. AR 576-77. Regardless of whether Plaintiff's lumbar spine treatment regimen was conservative, Plaintiff does not articulate in what respect any error by the ALJ would have been brought to bear on the RFC which limited Plaintiff to light exertional lifting with only 2 hours of standing and walking per day. Even though her testimony and Dr. Pandya's opinion, if credited, would establish that her veinous impairments preclude such activity, that does not appear to be the case with the lumbar spine. As such, Plaintiff does not identify harmful error by the ALJ with respect to Plaintiff's lumbar spine.

### b. **Anxiety**

The ALJ found Plaintiff's anxiety non-severe at step two. Plaintiff contends that the ALJ improperly rejected her testimony about her mental health, among other conditions. Defendant responds that because Plaintiff did not challenge the step two non-severity finding directly, the issue is waived. Resp. at 5, Doc. 19. However, issue headers and organizational structure aside, Plaintiff clearly challenges the non-severity finding with respect to her anxiety.[2] As noted below, the ALJ's reasoning for finding Plaintiff's anxiety non-severe at step two overlapped to a large extent with the reasoning for rejecting Plaintiff's testimony about her anxiety at step four (and declining to incorporate any mental limitations). Both these findings by the ALJ, as will be discussed, are unsupported.

At step two, the ALJ found Plaintiff's anxiety non-severe after considering the broad functional areas of mental functioning set forth in the disability regulations for evaluating mental disorders, and in the Listing of Impairments (20 CFR, Part 404, Subpart P, Appendix 1). These four broad functional areas are known as the "paragraph B" criteria. The ALJ explained as follows:

---

[2] The full diagnosis was actually "Adjustment disorder with mixed anxiety and depressed mood" (AR 376), colloquially referred to in the treatment notes as "depression/anxiety."

> In understanding, remembering, or applying information, the claimant has no limitations. The claimant alleged that she has difficulty remembering generally, understanding what is said to her, following instructions, completing tasks, paying bills, shopping, and driving. However, the claimant also stated that she could perform simple maintenance, prepare meals, go to doctor's appointments, take medications, shop, and drive. In addition, the record shows that the claimant was able to provide information about her health, describe her prior work history, follow instructions from healthcare providers, comply with treatment outside of a doctor's office or hospital, and respond to questions from medical providers. (Exh. 1F; 10F; 11F; 12F; 4E; Hearing Testimony).
>
> In interacting with others, the claimant has no limitations. Here, the claimant alleged that she has difficulty engaging in social activities and spending time in crowds. However, according to her statements, the claimant is also able to get along with others, shop, deal appropriately with authority, and live with others. Finally, the medical evidence shows that the claimant had a good rapport with providers, was described as pleasant and cooperative, and had good interactions with non-medical staff. (Exh. 1F; 10F; 11F; 12F; 4E; Hearing Testimony)
>
> The next functional area addresses the claimant's ability to concentrate, persist, or maintain pace. For this criterion, the claimant has mild limitations. The claimant contended that she has limitations in concentrating generally, focusing generally, following instructions, and completing tasks. On the other hand, the claimant said that she is also able to drive, prepare meals, and handle her own medical care. (Exh. 1F; 10F; 11F; 12F; 4E; Hearing Testimony).
>
> Finally, the claimant has no limitations in her ability to adapt or manage herself. The claimant asserted that she has difficulties handling change and managing her mood. That said, the claimant also stated that she is able to handle self-care and personal hygiene and care for children. Meanwhile, the objective evidence in the record showed the claimant to have appropriate grooming and hygiene, no problem getting along well with providers and staff, and normal mood and affect. (Exh. 1F; 10F; 11F; 12F; 4E; Hearing Testimony).

AR 21.

It is not clear what "perform simple maintenance" refers to as stated in paragraph 1. The ALJ's citation to 5 exhibits and the hearing testimony were all provided as one string citation at the end of each paragraph, each of which contained several factual assertions. Consequently, it is unclear which exhibit the ALJ intended to use to correspond with each assertion. Further, citing exhibits in their entirety with no accompanying pin citation is equally not helpful given some of them (such as Exhibit 10F) are over 100 pages in length.

In addition, the cited activities are not necessarily a strong basis upon which to rest a non-severity finding at step two, or an adverse credibility finding at step four, as most of the examples involve Plaintiff's participation in her medical care (taking medication, attending appointments, providing medical history).

As to social interaction discussed in the second paragraph, rapport with medical providers and cohabitation with family members are not exactly helpful indicators of social capacity in the workplace.

In the third paragraph, the ALJ cites Plaintiff's reported ability to drive as indicative of adequate concentration, but in paragraph one the ALJ noted that Plaintiff contended that she could not drive.  That contradiction was perhaps worth noting, and would require pin citations to substantiate.

Importantly, Plaintiff emphasizes treatment records noting Plaintiff was observed with anxious mood and her affect was worried, congruent, and reactive.  AR 378, 493-94. She reported severe anxiety and was too anxious to help her family and stated medications were ineffective. AR 493. She reported uncontrolled anxiety notwithstanding Cymbalta and Abilify. AR 388, 422-23, 581. Plaintiff testified she had "real bad anxiety and depression" unimproved with medication and therapy, which made her heart race, made her dizzy and numb, and was exacerbated when she left home. AR 44-45.  This is sufficient to meet the low threshold for a severe mental impairment at step two, characterized as "a de minimis screening device [used] to dispose of groundless claims." *Smolen v. Chater*, 80 F.3d 1273, 1290 (9th Cir. 1996).  An impairment is not severe only if it amounts to a slight abnormality with no more than a minimal effect on an individual's physical or mental ability to do basic work activities. 20 C.F.R. §§ 404.1522, 416.922.

Moving onto the RFC discussion prior to steps four and five, the ALJ explained as follows:

> The claimant also has nonsevere mental health impairments. She took various prescribed mental health medications such as Cymbalta and Abilify. (Exh.

> 10F/1). However, she only took some of it once before stating there was no benefit. (Exh. 10F/7). She stated she was always afraid but she was unable to identify any triggers for her symptoms. (Exh. 10F/3). She did not seek significant mental health treatment from a mental health specialist or attend therapy or other counselling services during the relevant time-period.

AR 24.

As to the ALJ's assertion that Plaintiff only took some medications once before declaring them ineffective, that is not entirely factually accurate, nor is the ALJ's intended inference (treatment non-compliance) supported. The cited record states as follows:

> Patient presents today for f/u on depression/anxiety. She states symptoms are unchanged despite taking cymbalta 120mg per day. We started abilify one month ago but she only took one time because it caused her to feel nauseous and to feel like she was going to "black out". She is open to treating again, trying to take medication at night.

Ex. 10F/7 (AR 382).

Plaintiff did not declare medications were ineffective after only one dose. Cymbalta is the medication she suggested was ineffective (after an unspecified duration of dosing 120mg), whereas *Abilify* was the medication she only took once. She stopped taking Abilify not because it was ineffective, but because she experienced nausea and dizziness/lightheadedness (which is a known side effect of Abilify[3]).

Further, she was open to trying Abilify again. Plaintiff and her provider apparently reached an understanding she would take it at night, ostensibly to minimize daytime side effects. AR 382 ("Notes: Restarting abilify today, dosing at bedtime. Patient to f/u in one month to reassess symptoms, sooner if increase/change."). That was as of the November 22, 2019, visit with PA-C Packer. AR 382. At a follow up with PA-C Packer on January 3, 2020, she reported unchanged symptoms on Cymbalta 120mg and Abilify 10mg, and the Abilify dosage was increased from 10mg to 20mg. AR 376. As of June 2020, she was still taking Cymbalta 120mg and Abilify 20mg as

---

[3] https://www.mayoclinic.org/drugs-supplements/aripiprazole-oral-route/side-effects/drg-20066890

11

prescribed. AR 504; *see also* AR 517 (same as of September 2020); AR 512 (same as of October 2020) AR 529 (same as of January 2021).

"[U]nexplained, or inadequately explained, failure to seek treatment or follow a prescribed course of treatment" can justify rejection of a claimant's testimony. *Fair v. Bowen*, 885 F.2d 597, 603 (9th Cir. 1989), *superseded on other grounds by* 20 C.F.R. § 404.1502(a); *Tommasetti v. Astrue*, 533 F.3d 1035, 1039 (9th Cir. 2008) ("The ALJ may consider many factors in weighing a claimant's credibility," including "unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment").

Here, due to side effects, the Plaintiff self-discontinued Abilify after the first dose of her first 30-day regimen. On November 22, 2019, her provider advised her to take it at bed time and all indications are that she did so from that point forward through January of 2021, one month prior to the February 2021 administrative hearing. Importantly, this does not support a finding of treatment non-compliance.

Next, the ALJ stated that Plaintiff "did not seek significant mental health treatment from a mental health specialist or attend therapy or other counselling services during the relevant time-period." AR 24. The record however does show that Plaintiff treated with Kellie Sulier, PsyD, on two occasions. AR 378, 439. Dr. Sulier is a mental health specialist. Further, the sessions would be appropriately characterized as psychotherapy.[4]

Furthermore, although Plaintiff attended only two sessions with Dr. Sulier, Plaintiff did regularly discuss her mental health with PA-C Packer, as cited above, who managed her psychotropics (Cymbalta, and Abilify). Defendant responds that the ALJ did cite Dr. Sulier's treatment records amidst the ALJ's citation of mental status examination findings, including:

---

[4] "Psychotherapy is an approach for treating mental health issues by talking with a psychologist, psychiatrist or another mental health provider." https://www.mayoclinic.org/tests-procedures/psychotherapy/about/pac-20384616

Plaintiff repeatedly demonstrated an appropriate mood and affect (AR 24, citing AR 251, 257, 261, 263, 266-67, 269, 272, 275, 297, 299, 301, 303, 324, 487, 489, 491, 496, 502, 506); although she sometimes exhibited a depressed or anxious mood (AR 24, citing AR 378, 493), she was calm and cooperative on examination (AR 24, citing AR 376, 380, 397, 502-28; she retained intact insight and judgment (AR 24, citing AR 376-486, 491), spoke normally (AR 24, citing AR 378, 491); and, Plaintiff denied suicidal thoughts, homicidal thoughts, delusions, and hallucinations (AR 21. citing AR 376-501).

However, the ALJ's findings with respect to Plaintiff's anxiety were not based solely on these mental status examination findings Defendant highlights above, but on other unsupported reasoning as also discussed above. The Court therefore finds that Remand is appropriate for the ALJ to reconsider Plaintiff's mental health treatment history and symptom allegations and reach a conclusion about what work related limitations (if any) the evidence supports.

### c.     Vein Impairment and Coagulation Disorder

One of Plaintiff's treating providers, Dr. Pandya (a general surgeon to whom she was referred for specialized treatment and possible surgical evaluation of her veinous impairments) opined Plaintiff can stand/walk for 15 minutes at a time, would need 15 minute rest breaks, cannot use her legs for foot controls more than 10% of the time, must elevate her legs for 10% of an 8-hour workday, can bend/stoop/balance for 10% of the workday, that her pain is exacerbated by emotional stress resulting in off-task behavior for 15-20% of the workday. AR 535–36. Dr. Pandya attributed the limitations to bilateral varicose veins, painful swelling, and history of deep vein thrombosis. *Id.* In terms of support for his findings, Dr. Pandya identified "laboratory, ultrasound." *Id.*

Similarly, Plaintiff testified she has constant leg pain due to varicose veins and swelling, which is exacerbated by standing and walking, unrelieved by compression stockings or pain

medications, unrelieved by her most recent procedure, and that the pain is relieved only by periodic leg elevation for 15 minutes throughout the day. AR 39–44.

The ALJ rejected Dr. Pandya's opinion, explaining as follows:

> The claimant's treating physician, Dr. Pandya, completed a functional assessment. (Exh. 14F). Dr. Pandya opined the claimant could lift and carry more than light (more than 20 pounds), stand/walk for 15 minutes, and other limitations. This is not persuasive. It is not supported by any significant narration or explanation and was merely a checked box form. It is also inconsistent with the record as a whole. There was no explanation given for the extreme limitations, such as only standing/walking for 15 minutes, and no information about the time period it covered.

AR 26

The critique of check box forms is unpersuasive. The agency maintains its own check box forms for treating providers to complete, which are quite similar in form and content to the one Dr. Pandya completed, with similarly limited space for narration (such as form HA-1151, Medical Source Statement of Ability To Do Work Activities (Physical)).[5] Dr. Pandya's explanation could perhaps have been amplified had he: 1) cited not just varicose veins and swelling but severe varicose veins and swelling upon physical examination and the dates of such examinations;  2) cited not just history of DVT, but the procedure that predated the relevant period; and 3) cited not just "ultrasound, laboratory," but the duplex ultrasound scans, their dates and the findings.

Notwithstanding, it is apparent the ALJ was able to locate the clinical findings and test results Dr. Pandya referenced.  The relevant time period was the roughly 19 months between the SSI application date of October 4, 2019, and the ALJ decision date of April 22, 2021.  The examinations noting varicose veins and edema, and the duplex scans noting other abnormalities, clearly fell within that period. Those findings certainly supported the *types* of limitations addressed (leg elevation and limitation on extended standing and walking), even if the ALJ felt the record did

---

[5] https://omb.report/omb/0960-0662 (SSA uses Forms HA-1151 and HA-1152 to collect data that is required to determine the residual functional capacity (RFC) . . . respondents are medical sources paid by SSA to provide reports based either on existing medical evidence or on consultative examinations conducted for the purposes of the report).

14

not necessarily support the extent thereof. There is little uncertainty about what clinical findings and ultrasounds Dr. Pandya was referencing.

Moving past the ALJ's isolated paragraph concerning Dr. Pandya's opinion, of more importance is the ALJ's assertion that the opinion was unsupported by the evidence.

In discussing the objective evidence regarding the veinous impairments, the ALJ first stated as follows:

> Venous duplex examination of the lower extremities in October 2018, December 2018, November 2019, and December 2020 were generally normal with no evidence of deep venous thrombosis. (Exh. 9F/1, 5; 15F/10; 3F/5, 7).

AR 24.

Although there was no evidence of DVT on any scan, and while the duplex scans were normal in October 2018, December 2018, and November 2019, importantly, the duplex scan on December 12, 2020, was not normal. The diagnosis in both legs was "Leg incompetent Cockett's, perforators with deep to superficial veinous reflux." AR 546–47. An additional diagnosis of the left leg was "Incompetent Poplitiosaphenous valves with reflux into dilated SSV." AR 547. Clinical observations included telangiectasis or reticular veins, varicose veins and edema. *Id.*

Next, the ALJ stated: "Examination findings were generally fairly normal. The claimant often appeared as alert, oriented, and in no acute distress." (Exh. 10F; 11F; 12F; 1F). This observation can best be described as a rather generalized proposition, which is supported by an equally generalized string citation to five different exhibits collectively spanning 166 pages with no pin citations, the assertion therefore adds little to the ALJ's decision.

Next the ALJ stated as follows:

> Occasionally, she had some mild pitting edema in both lower extremities, along with dilated varicose veins. (Exh. 15F/15; 9F/5, 24; 10F/73; 3F/3). Otherwise, Extremities were normal with no clubbing, cyanosis, or edema. (Exh. 9F/5; 10F/28; 16F/9; 1F/8; 2F/11).

The description is generally supported by the cited records with the exception that Exhibit

9F does not have a page 24, edema was occasionally described with no accompanying description of mild severity (AR 547), and the varicose veins were sometimes described as "severe" (AR 369), though these subtleties would not independently warrant remand.

Next the ALJ discussed extensive benign examination findings regarding motor strength, range of motion, sensation, straight leg raise, and heel/toe walking, which Defendant emphasizes as a general matter. Those findings however relate to the lumbar spine and were discussed above. The mild findings on lumbar spine imaging and benign findings on physical examination do support the ALJ's conclusions with respect to limitations arising from the lumbar spine, but do little with respect to the veinous impairments. Dr. Pandya did not attribute any limitations to the lumbar spine impairment (nor did any clinician), but did in fact opine that Plaintiff could meet the lifting and carrying requirements of light work as the veinous impairments in her legs would presumably not impede weight lifting. However, periods of leg elevation would be a distinct limitation attributable to the veinous impairments.

Next, the ALJ asserted that Plaintiff's impairments were treated conservatively with medication and physical therapy, except for the ultrasound guided localization and stripping of the left long saphenous vein occurring prior to the relevant period. Plaintiff disputes the ALJ's citation only to pre-application procedures when she also was referred for other related treatments. Defendant responds that Plaintiff does not identify such a treatment specifically, and a referral alone is speculative. The December 2020 duplex scan exhibit discussed above contained an unsigned consent form to undergo Left Short Saphenous Vein Radiofrequency Ablation. *See* AR 541 ("Obtain Consent for: Left Short Saphenous Vein, radiofrequency ablation with VNUS Closurefast Radiofrequency catheter, under Color Duplex US guidance." Counsel's pre-hearing brief before the ALJ also referenced a procedure that took place on January 8, 2021, records which he requested

but which were not received. AR 237.[6]

Next, the ALJ stated that "After being prescribed opioids, she reported no adverse side effects and that she was able to function well and do activities of daily living without much pain. (Exh. 16F/11)." The statement was found at the end of visit notes dated August 25, 2020, which were pulled from a boilerplate paragraph concerning safe opioid practices and the CDC's related guidelines, quoted in full in the footnote below.[7] The paragraph appears in multiple places in the record (*see also* AR 577) and is a familiar one frequently appearing in records from pain management clinics. It appears to be a non-patient-specific recital of standardized findings made in each patient's case to substantiate ongoing opioid prescriptions.

However, a non-disability finding should not be wholly or partially predicated on a boilerplate notation that the claimant meets the "4 A's" of pain management, particularly when there is more direct evidence indicating otherwise. Indeed, several pages prior in the same exhibit, the visit notes reflect that patient reported severe pain level 10/10 without medication and 8/10 with

---

[6] This would not be an independent basis for remand as it is Plaintiff's burden to provide evidence of her condition. But because remand is otherwise warranted in light of the other errors discussed herein, further inquiry should take place on remand as to what additional procedures, if any, took place during the relevant period (or sufficiently close in time to the relevant period that the fact of the referral itself might speak to the need for non-conservative treatment beyond what the ALJ noted. Contrary to Defendant's suggestion, a referral is not necessarily speculative if it reflects the provider found a procedure medically necessary).

[7] Clinical Notes: Opioids prescribing: Discussed with the pt that due to the serious risks of addiction and overuse especially with prolonged use, Lags Medical Centers rarely prescribes high dose opioids. Opioids must be a part of the comprehensive tx plan in the treatment of chronic pain after all non-narcotic treatment options have failed. Advised on CDC opioid Rx guidelines on LT use of opioids, recommending the lowest effective dose of 50MME/day and extreme caution should be used when taking over 90 MME/day. Discussed serious s/e of opiods including CNS and respiratory depression, addiction, overdose, and death. Start narcan in compliance to CDC guidelines on opioid prescribing, https://www.cdc.gov/drugoverdose/prescribing/guideline.html. , Total Daily MME"s (morphine milligram equivalents) is . Consider Narcan Nasal Spray if 50 MME"s and above.
This is in compliance with current CDC Guidelines for Opioid Prescribing: www.cdc.gov/drugoverdose/prescribing/guideline.html Patient reports no adverse side effects from the pain medications, and is able to function well and do activities of daily living without much pain. *In regard to medications the patient meets the 4 A"s of pain management including good Analgesic effects with current medication regimen, increased Activities of daily living with the use of medications, no significant Adverse side effects, and no concern for Aberrant behavior.* The patient is consistent with follow up care and does have a current pain contract on file with our office. Department of Justice (DOJ) CURES website checked, and no red flag activities noted. Advised not to take alcohol containing products with pain medications. The patient was provided with a refill of their pain medication.

medication. AR 574.

Next, the ALJ stated:

> Although immaterial to the determination in this case, the record reflected some substance use. The claimant smoked cigarettes daily despite her comorbid conditions related to the cardiovascular/hematological systems. (Exh. 10F). She also tested positive for cannabinoids. (Exh. 16F/13). These substances likely contributed to the severity of some of her symptoms and/or reduced the efficacy of prescribed treatment.

AR 25.

Substance abuse is specifically addressed in the regulations at 20 C.F.R. 416.935, which disallows an award of benefits where: a) the ALJ finds drug addiction or alcoholism; and b) the substance abuse is a contributing factor material to the determination of disability. However here, the ALJ did not make those findings either overtly or by reasonable implication, nor did the ALJ reference that regulation. Additionally, it was not established that Plaintiff's non-specific use of cannabinoids contributed either to the severity of her symptoms or reduced the efficacy of prescribed treatment. Thus, this statement by the ALJ is of little consequence.

Next the ALJ stated as follows:

> Despite the claimant's impairments, she has been able to perform a variety of activities. She took care of three children, one of whom was disabled. She had no problem maintaining her personal care needs. She prepared meals and shopped by phone. (Exh. 4E). Further, she cleaned her home, drove, cooked, and bathed and dressed herself. (Exh. 16F/1). Of note, the claimant did not provide a function report (other than the third party report of her mother).

AR 25.

In regard to the children, Plaintiff emphasizes that her children were ages 14, 18, and 21, and they not only took care of themselves but helped her around the house. MSJ at 13 (citing AR 45–46). Defendant responds that those were the ages of the children <u>at the time of the hearing</u> which was more than 1 year after the start of the relevant period, and that Plaintiff was therefore raising at least two minor children as of the beginning of the relevant period. Resp. at 9. Indeed,

Defendant is correct, the children would have been no older than 13, 17, and 20 at the start of the relevant period, which means two of them were minors.  However, that does not undermine Plaintiff's explanation that children of that age can care for themselves and for their mother as well.

### VI.     Conclusion

There is no basis to find harmful error with respect to the ALJ's analysis of Plaintiff's lumbar spine impairment or limitations arising from it.

As to the ALJ's step two finding that Plaintiff's anxiety was non-severe, the discussion of each of the four areas of mental functioning was substantiated by a very thin factual basis, string citations to entire exhibits numbering hundreds of pages without pin citations, undue inferences (that cohabitation with family is indicative of social capacity in the workplace), and internal inconsistencies (as to Plaintiff's ability to drive).  The ALJ's related discussion at the RFC stage and dismissal of Plaintiff's related testimony was also unsupported in that it relied on such seemingly factual inaccuracies as Plaintiff declared psychotropics being ineffective after one dose and self-discontinued, or that Plaintiff did not treat with a mental health specialist or attend therapy.

 In addition, the ALJ's rejection of Dr. Pandya's opinion concerning the veinous impairments and Plaintiff's testimony was not free of harmful error as described above.

Remand is therefore appropriate for the ALJ to reconsider Plaintiff's mental health treatment history and symptom allegations and reach a reasoned and supported conclusion about what work related limitations (if any) the evidence supports.  Remand is also appropriate for the ALJ to revisit Dr. Pandya's opinion concerning the limitations attributable to Plaintiff's vein impairments (particularly with a view toward periodic leg elevation) and Plaintiff's testimony concerning same.

### VII.    Order

For the reasons stated above, substantial evidence and applicable law do not support the

ALJ's conclusion that Plaintiff was not disabled. Accordingly, it is ordered that the Commissioner's decision is reversed and this matter is remanded to the Commissioner pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. The Clerk of Court is directed to enter judgment in favor of Plaintiff Carolyn Jean Moreno and against Defendant Commissioner of Social Security.

IT IS SO ORDERED.

| Dated: | **March 29, 2024** | **/s/ Gary S. Austin** |
|---|---|---|
| | | UNITED STATES MAGISTRATE JUDGE |